IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEMETRE A. HOLLAND, | CASE NO. 1:24-cv-1540 |
| Plaintiff, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT & RECOMMENDATION** |
| Defendant. | |

Plaintiff Demetre A. Holland filed a Complaint against the Commissioner of Social Security seeking judicial review of a decision denying his application for supplemental social security income benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

### Procedural Background

In December 2021, Holland filed an application for supplemental security income alleging a disability beginning in March 2020.[1] Tr. 165–71. In

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

pertinent part, Holland alleged that he was disabled and limited in his ability to work due to anxiety, arthritis in both shoulders, difficulty sleeping, chronic pain, having a chip in a bone in his upper neck, lower back fracture, numbness in left ring finger, problems with both knees, and asthma. Tr. 202. The Commissioner denied Holland's application initially and on reconsideration. *See* Tr. 84, 95.

In September 2022, Holland requested a hearing. Tr. 121. In June 2023, Administrative Law Judge (ALJ) Jeannine Lesperance held a telephonic hearing. Tr. 33–62. Holland appeared, testified, and was represented by counsel at the hearing. Tr. 33–56. Qualified vocational expert Patricia Murphy also testified. Tr. 56–62. In September 2023, the ALJ issued a written decision, which found that Holland was not entitled to benefits. Tr. 14–32.

In October 2023, Holland appealed the ALJ's decision to the Appeals Counsel. Tr. 161–64. In July 2024, the Appeals Counsel denied Holland's appeal, Tr. 1, making the ALJ's September 2023 decision the final decision of the Commissioner, Tr. 14–32; *see* 20 C.F.R. § 404.981.

Holland timely filed this action in September 2024. Doc. 1. In it, he asserts one issue, which consists of at least two separate, sub-issues, for the Court's review:

1. Whether the ALJ erred when failing to identify substantial evidence supporting the residual functional capacity finding.

2. Whether the ALJ erred when failing to comply with the regulations regarding

> medical opinion analysis and when failing to
> comply with SSR 13-6p regarding Plaintiff's
> subjective allegations.

Doc. 10, at 1.

**Evidence**[2]

*Personal, Education, Vocational Experience*

Holland was born in 1976 and was 44 years old on the alleged onset date. Tr. 188. He completed high school and previously worked as a welder, warehouse laborer, and truck driver. Tr. 190–200, 203.

*Medical Evidence*

Beginning in May 2021, Peter Markovic, D.C., Holland's chiropractor, treated Holland for severe pain following a motor vehicle accident occurring in April 2021. *See* Tr. 270. Holland reported the ability to move his arm in front and beside him, but that he experienced 10/10 pain if he attempted to twist his arm behind his back. *Id.* He had tenderness in his right shoulder, but normal range of motion in his neck and was referred to an orthopedist. Tr. 271.

In September 2021, Holland presented to Dr. Markovic for a re-evaluation of his condition following the April 2021 accident. Tr. 285. Holland had a decreased range of motion in the cervical spine for both extension and bilateral rotation movements. Tr. 286. Holland also had limited range of motion in his lumbar spine in both extension and bilateral flexion movements. *Id.* Among other findings, Dr. Markovic noted that "[t]he examination findings

---

[2]     The evidence summarized here is not intended to be exhaustive and is generally limited to the evidence discussed in the parties briefing.

3

objectively confirm my diagnosis and clinically correlate with the patient's subjective complaints." Tr. 287.

In January 2022, Dr. Markovic again examined Holland and found decreased range of motion of the cervical spine for extension, bilateral lateral flexion, and bilateral rotation. Tr. 283. He also noted limited range of motion in Holland's lumbar spine for both extension and bilateral lateral flexion. Tr. 283. Dr. Markovic again remarked that "the examination findings objectively confirm my diagnosis and clinically correlate with the patient's subjective complaints." *Id.*

In an undated letter, Dr. Markovic described that Holland "suffered a permanent injury and is still currently under my care and likely will be for the balance of his life. His pain and disability involve his neck and both shoulders. These derangements are very limiting and pain producing." Tr. 853.

In June 2021, Holland elected to receive a right shoulder injection "to aid in decrease in inflation shoulder and coordination with home therapy exercises." Tr. 292.

In September 2021, Brian R. Williams, M.D., performed an MRI of Holland's right shoulder. Tr. 262. The MRI showed rotator cuff tendinosis; mild biceps tendinosis; mild acromioclavicular osteoarthritis; and mild glenohumeral osteoarthritis with labral degeneration most notably superiorly. Tr. 262–63.

4

Also in September 2021, Robert P. Klym, MD, performed an MRI of Holland's lumbar spine. Tr. 429–30. Dr. Klym's impressions were that Holland had: (1) "Schmorl's nodes[3] at L1-L2[4] are small and appear chronic;" (2) no marrow edema pattern; and (3) "Mild disc degeneration and fairly mild disc bulges at lower levels. No central stenosis." Tr. 430.

Later in September 2021, Holland presented to an emergency room with "a one-day history of right upper dental pain and complaints of decreased appetite and some nausea with weakness and body aches[.]" Tr. 421. Holland was discharged with Zofran for his nausea, encouraged to increase fluids over the next three to five days, and tested for COVID-19, which later showed a value "detected." Tr. 425–426.

---

[3]     Schmorl's nodes, or intervertebral disc herniations, happen when the internal material of intravertebral disks poke through the outer layer and burrow into adjacent vertebrae. They are relatively common and usually do not cause symptoms. *See* Olga Askinazi, PhD, reviewed by Angelica Balingit, M.D., What Are Schmorl's Nodes, and Should I be concerned About Them?, Healthline,            https://www.healthline.com/health/schmorl-nodes [https://perma.cc/3ZK4-AXG8].

[4]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral     Column,     Spine-health     Resources,     https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id.* The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources,     https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

In October 2021, Holland presented for an office visit with Julie Burkhart, APRN-CNP.[5] Tr. 273. Burkhart remarked that the reason for his visit was self-referral to address: anxiety, gastroesophageal reflux disease, asthma, shoulder pain, and dental pain. *Id.* Burkhart noted that Holland's breathing problems were triggered by seasonal changes, heat and humidity, rhinorrhea, congestion, and grass. Tr. 273. Holland reported that: he "sometimes has panic attacks;" he "fears" getting surgery for his right shoulder; and, his "anxiety is starting to affect daily activities." Tr. 273. Burkhart noted that Holland's mood was anxious and prescribed Lexapro for "moderate anxiety." Tr. 274–75.

In November 2021, Holland returned to Burkhart for anxiety, hand pain, tingling, leg pain, shortness of breath, esophageal reflux, and asthma. Tr. 277. He stated that he stopped taking Lexapro because he had a panic attack the first morning that he took it, but Burkhard "encouraged to restart Lexapro in the evenings without other medication." Tr. 277. Burkart continued to note Holland's anxious mood. Tr. 279.

In February 2022, Holland participated in a physical therapy appointment for treatment of cervicalgia, pain in the thoracic spine, and

---

[5]     APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id.*

lumbar region radiculopathy. *See* Tr. 368–70.[6] Holland described bilateral shoulder pain, and lumbar and neck pain that "is constantly getting worse since [his motor vehicle accident] [i]n April 2021." Tr. 368. Holland's range of motion for his spine and shoulder was limited. Tr. 368–69. He had an "overall loss of functional lumber and thoracic movement" and his "strength test [was] limited by pain." Tr. 369. Holland was also "very sensitive to touch and very tight in the UT, scapula, thoracic region." *Id*. Holland's physical therapist noted that he

> is showing slow, but continual progress. He is able to reach slightly above 90 degrees and improving endurance. Pt's overall cervical mobility is improving with less whole body compensation. Encouraged more frequent movement throughout the day with expected continual progress.

*Id*.

Later in February 2022, Arjun Sharma, M.D. of Avita Ontario Pain Clinic conducted a medication monitoring appointment. Tr. 406–11. On examination, Dr. Sharma noted "moderate difficulty transitioning from sitting to standing;" "a(n) antalgic gait;" that Holland's "cervical spine demonstrates a flexion biased curve" but "no deformity" and "no abnormality in muscle tone in the cervical spine." Tr. 409. Dr. Sharma also noted that Holland experienced a limited range of motion in the cervical spine and moderate limitations in

---

[6]   This treatment note indicates that it reflects Holland's fifth visit. Tr. 368. The medical record provided, however, contains only this treatment note from Crane Physical Therapy. There is a duplicate of this same treatment note located elsewhere in the record, but it is identical to the record discussed. *Compare* Tr. 368–70, **with** Tr. 905–07.

"extension, rotation, and lateral bending." *Id.* Dr. Sharma assessed Holland with cervical radiculopathy, myofascial pain, and cervical spondylosis with radiculopathy, and neck pain. Tr. 409. Holland was prescribed liquid Gabapentin because he stated he could not tolerate pills. Tr. 410.

In March 2022, Dr. Sharma performed a right C7-T1 epidural steroid injection under fluoroscopy. Tr. 956–58.

Later in March 2022, Dr. Sharma continued to treat Holland for his neck and right shoulder pain. Tr. 397–400. Holland reported his pain level at an eight out of ten, that increased with activity, lifting, and weather changes. Tr. 397. He had numbness and tingling in the feet. His most recent epidural steroid injection in March 2021 gave him moderate relief of neck pain and minimal relief of shoulder pain. Tr. 397. Dr. Sharma interpreted that an MRI of Holland's of lumbar spine showed:

> Modest loss of disc space height. Mild disc bulge. No central stenosis [at L3-4]. Mild loss of disc space height. Slight disc bulge. No HNP or central stenosis [at L4-5]. Mild loss of disc space height. Mild disc bulge is slighted canted to right. Neither S1 root sleeve is effaced or displaced on axial T1. No central stenosis [at L5-S1].

Tr. 399.

In April 2022, Holland reported to the emergency room with chest pain. Tr. 383–96. An echocardiogram revealed sinus tachycardia. Tr. 396.

In May 2022, Dr. Sharma performed "Left C3-4 and C4-5 facet joint block under fluoroscopic guidance" to address Holland's chronic neck pain. Tr. 965–66.

8

Also in May 2022, Erica L. Clinker, APRN-CNP, of Avita Ontario Pain Clinic, treated Holland for headache and left shoulder pain. Tr. 380. Holland reported his pain level at an eight out of ten and stated it "increased with activity and is relieved by relaxation." Tr. 380. Holland described moderate relief from the facet block administered by Dr. Sharma a week earlier. *Id.* He continued to report medical marijuana use. *Id.* Clinker noted moderate difficulty transitioning from sitting to standing and an antalgic gait. Tr. 381. She also identified that Holland's cervical spine demonstrated a flexion-biased curve and that he had limited range of motion in the cervical spine with right cervical paraspinal tenderness. *Id.* She assessed Holland with cervical spondylosis and chronic pain syndrome. Tr. 382.

In June 2022, Dr. Sharma saw Holland for two follow-up appointments. *See* Tr. 769, 739. Holland reported daily migraines since he received the facet block in May 2022. *See* Tr. 769, 740. Among other symptoms, Holland had moderate difficulty transitioning from sitting to standing, antalgic gait, and limited range of motion in the cervical spine. Tr. 771. Dr. Sharma also performed a left C3-4 and C4-5 facet joint block under fluoroscopic guidance. Tr. 741–43.

In July 2022, Nurse Clinker treated Holland during a follow-up appointment regarding his neck and the head pain experienced. Tr. 709, 711. Holland described that the facet blocks provided significant relief for about an hour and a half. Tr. 715.

9

In August 2022, Holland received additional treatment at Avita Ontario Orthopedics for his continued bilateral shoulder pain. Tr. 654—71. Holland received shoulder injections to address his pain. Tr. 657—59.

In September 2022, Nurse Burkhart treated Holland based on his description of constant migraine and "out of control" anxiety. Tr. 575. On examination, Holland stated that he experienced dizziness, but that Meclizine helped. Tr. 575. His mood was anxious and Burkhart referred him to psychology for moderate anxiety. Tr. 577.

In October 2022, Holland sought treatment at Avita Ontario Family Medicine, primarily to address his moderate anxiety also in addition to his mild asthma, cervical spondylosis, and left hand tendonitis. Tr. 526. Holland reported headaches and panic attacks. Tr. 529.

In December 2022, Dr. Sharma again treated Holland for his shoulder and spinal pain. Tr. 505–15. Holland again had moderate difficulty transitioning from sitting to standing, an antalgic gait, and a limited range of motion in the cervical spine with cervical tenderness. Tr. 510. Holland, however, described significant relief of over 80% following his second facet block. Tr. 511.

Later in December 2022, Holland again sought treatment at Avita Ontario Orthopedics for quadriceps tendinitis, impingement syndrome in his shoulders, and numbness and tingling of left leg. Tr. 484–504. Holland stated that his pain had returned since his prior injections in August 2022 and was

10

progressively worsening. Tr. 486. Injections were administered his shoulders. Tr. 489–92.

From February through May of 2023, Brian A. Ballitch, D.C., provided chiropractic care to address Holland's neck, middle back, and lower back pain. Tr. 1007–34.

From March through May 2023, Star June, LSW, provided telehealth counseling appointments. Tr. 1039–54. June noted that Holland displayed depressive symptoms, including: change in appetite or weight; change in sleep; depressed mood; loss of energy; loss of interest or pleasure; thoughts of worthlessness or guilt; and trouble concentrating. Tr. 1039. He also had anxious symptoms, including: chest pain; difficulty concentrating; dizziness; fatigue; feelings of losing control; irritable; racing thoughts; and shortness of breath. Tr. 1039.

In March 2023, Dr. Sharma continued to treat Holland for his back, shoulder, and neck pain. Tr. 438–45.

*Opinion Evidence*

In April 2022, Dr. Markovic, Holland's chiropractor, completed a one-page, check-box form titled: "Residual Functional Capacity Questionnaire – Physical." Tr. 377–78. Dr. Markovic indicated that he had treated Holland since May 2021. Tr. 377. He marked that Holland could: sit for a total of four hours continuously, and six hours with rests; stand for four hours continuously, and sit for five with rests; and walk for five hours continuously, but six hours

11

with rests. *Id.* He also marked that Holland could lift and carry 10 pounds occasionally, but never lift or carry 11 or more pounds. *Id.* Dr. Markovic further indicated that Holland could occasionally bend, squat, crawl, and climb. *Id.* Dr. Markovic selected a box indicating that Holland's pain or other symptoms would frequently to continuously interfere with his ability to "maintain attention and concentration needed to perform simple work tasks" and that Holland would likely be absent from work four or more days per month. *Id.*

    *State Agency Reviewers*[7]

In January 2022, state agency reviewing physician W. Scott Bolz, M.D. opined that Holland could "lift and/or carry" 20 pounds occasionally and 10 pounds frequently; "stand and/or walk" for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb landers, ropes, or scaffolds; occasionally push and pull with the right upper extremity; frequently reach in front and overhead with the right upper extremity; occasionally stoop or crawl; frequently climb ramps or stairs; and, frequently kneel or crouch. Tr. 68–9. Dr. Bolz found no manipulative limitations with handling, fingering, or feeling on either side and no manipulative limitations in the left side. Tr. 69. Dr. Bolz further opined that

---

[7]    Holland makes no discernable challenge to his mental residual functional capacity findings or the state agency reviewers' opinions regarding his mental residual functional capacity. Holland also makes no discernable challenge, and does not appropriately cite, the vocational expert's testimony in his briefing. So discussion of this evidence is omitted.

Holland should "[a]void all dangerous machinery, unprotected heights due to R[ight] shoulder rotator cuff tendinosis." Tr. 70.

In July 2022, Leon Hughes, M.D. generally affirmed Dr. Bolz's opinion, with additional reduced limitation that Holland could only stand or walk for a total of two hours. *See* Tr. 78–80.

*Holland's Function Report*

Holland completed a Function Report in December 2021. Tr. 209–17.[8] He wrote that he lived alone in a house. Tr. 209. He reported that bending hurts and he has severe pain in the lumbar section of his back. *Id.* Holland described that he could stand for 30 minutes at a time and lift five pounds. *Id.* He denied any problems with using the toilet, caring for his hair, or feeding himself and said that he did not really have problems with bathing or shaving. Tr. 210. He remarked, however, that it was sometimes difficult to get out of the bath or remove his pants. Tr. 210. Holland described that his day typically included: preparing simple meals, reading, watching TV, doing therapy stretches, showering, attending doctor's appointments, running errands such as going to the grocery store, and paying his bills. Tr. 211. He also explained that he spent time texting and calling friends. *Id.* Holland further reported doing "light cleaning," including vacuuming, sanitizing, and dusting, though

---

[8]     The function report contains Holland's descriptions of both physical and mental functions. Since Holland raises no argument that the ALJ failed to include certain mental limitations, the summary below predominantly concerns his described symptoms and how they interfere with his physical functioning.

he later explained that cleaning could be time-consuming so he would take breaks. Tr. 211–12. Holland wrote that, depending on how his body felt, he "sometimes" mowed the lawn with a riding lawnmower. Tr. 212. He reported driving when he needed to go places. Tr. 213. Holland said he shopped for food, clothes, and cleaning supplies in stores but would only spend about 15 minutes shopping. *Id*.

   *Testimony*[9]

   Holland testified that he lived with his fiancée and niece. Tr. 40. He reported driving about once a week either to attend a doctor's appointment or go to the store. Tr. 41. Holland stated that he could not work because he could no longer lift heavy things overhead and because his feet tingled and went numb if he stood for long periods. Tr. 48. He explained that he could not have a job that mostly involved sitting because sitting caused lower back pain. Tr. 49. If he sat for too long, he had to get up and move around to alleviate the pain. Tr. 49. Holland testified that pain injections helped him for about a month or two after each injection. *Id*. He said his pain was less severe with the injections as long as he just did "normal" things, but that if he did "a little too much that pain is there." *Id*. Holland reported recent neck pain as well and said that his x-rays showed a bone spur. Tr. 49–50. He described shoulder pain, that is worse on his right side. Tr. 50. The ALJ asked Holland whether surgery

---

[9]   As indicated in footnote 7, Holland does not appropriately cite or discernably challenge the vocational expert's testimony, so discussion of that evidence is omitted.

was recommended. Tr. 51. Holland testified that he had never had surgery before and said that he panics at the idea of surgery because he has never had it before and fears anesthesia. Tr. 51–52. Holland explained that he handled his own personal care but dressing himself was hard. Tr. 54. Near the end of the hearing, Holland said  that he no longer mowed his lawn. Tr. 55. He also testified he could handle things like holding a coffee cup but not for "that long." Tr. 56.

**ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 22, 2021.

2. The claimant has the following severe impairments: right shoulder arthritis and tendinosis; right biceps tendinitis; left shoulder arthritis; cervical spondylosis; lumbar degenerative disc disease; and asthma. (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 16.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b). Specifically, the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand/walk 4 hours in an 8 hour work day; sit without limitation; occasionally push and pull; occasionally reach

15

overhead; frequently reach in front and laterally; occasionally climb ramps and stairs, stoop, kneel, and crouch; never climb ladders, ropes or scaffolds or crawl; frequently handle and finger; never work around hazards such as unprotected heights or work in proximity to exposed, moving mechanical parts; and never engage in occupation driving; he can have occasional but not concentrated exposure to temperature extremes, humidity, and atmospheric conditions.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on January 8, 1976, and was 45 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable jobs skills (See SSR 82–21 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

> 10.    The claimant has not been under a disability, as defined in the Social Security Act, since November 22, 2021, the date the application was filed (20 CFR 416.960(g)).

Tr. 19, 22, 27, 28.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1.    Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2.    Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3.    Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4.    What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

17

disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than

18

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ properly considered Holland's subjective symptoms.*

Holland first asserts that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to comply with SSR 16-3p when she considered his subjective complaints. Doc. 10, at 13.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other

19

relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

An initial issue with Holland's first argument is that he admits that the ALJ discussed several of the factors required when considering Holland's subjective symptom complaints. *See* Doc. 10, at 14 ("The ALJ found Plaintiff's allegations to be inconsistent with the record primarily due to Plaintiff's marijuana use, failure to proceeds with a radiofrequency ablation (RFA) in the cervical spine, and activities of daily living.") (citing Tr. 24, 25). After effectively conceding that the ALJ did discuss some of the factors outlined in Ruling 16-3p, Holland proceeds to argue why he disagrees with the ALJ's conclusions based on his consideration of those factors. Doc. 10, at 14–15.

20

Holland makes three arguments to support his disagreement with the ALJ's consideration of the factors outlined in Ruling 16-3p.

First, Holland asserts that "the record contains extensive objective evidence consistent with Plaintiff's allegations." *Id.* at 15. In support, Holland cites portions of the ALJ's decision where the ALJ described the record and the ALJ's statement that, despite these records documenting "shoulder, neck and lumbar spine impairments, objective findings and the claimant's course of treatment are not consistent with his subjective complaints at the hearing." *Id.* at 15–16 (citing Tr. 23). So Holland's briefing points out that the ALJ *did* consider the objective record evidence when evaluating his subjective complaints. Nevertheless, Holland argues that the ALJ selectively evaluated the record to the exclusion of evidence that he believes would have supported a different outcome. *See* Doc. 10, at 16–17. But the fact that Holland can point to evidence in the record not specifically highlighted by the ALJ when evaluating his subjective complaints, does not mean that the ALJ did not consider that evidence. To the contrary, the ALJ stated she considered the entire record.  Tr. 18. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *cf. Higgs v. Bowen*,

880 F.2d 860, 864 (6th Cir. 1988) (noting that the Appeals Council "state[d] that it 'considered the entire record which was before the administrative law judge, including the testimony at the hearing'"). Holland does not provide any support for his apparent argument that the ALJ must recite all evidence, favorable or unfavorable, when rejecting subjective complaints. *See* Doc. 10, at 14–15. This is, perhaps, because the ALJ was not required to recite all of the evidence in order to properly consider his complaints. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand.").

Second, Holland argues that "the ALJ relied upon Plaintiff's 'course of treatment,' including lack of surgery and opiate medications, as the prevalent reason for discounting Plaintiff's allegations." Doc. 10, at 17 (citing Tr. 23–24). Considering Holland's course of treatment is, however, precisely what the ALJ should do when analyzing the persuasiveness of subjective symptom complaints. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. But Holland asserts that the ALJ erred in considering his course of treatment because she "failed to consider that there were valid reasons why [he] did not have certain types of treatment." Doc. 10, at 18. To this end, he claims that "the ALJ failed to consider whether Plaintiff's intense fear and anxiety was a legitimate reason or not proceeding with surgery" and "failed to note anywhere in the decision that Plaintiff was no[t] abusing marijuana[.]" Doc. 10, at 19.

The ALJ was required to consider possible reasons why a claimant failed to seek medical treatment before drawing an adverse inference from the claimant's lack of treatment. *See Eddington v. Comm'r of Soc. Sec.*, No 1:24-cv-00564, 2025 WL 39858, at * 2 (N.D. Ohio Jan. 7, 2025) (citations and quotations omitted). Here, the ALJ complied with this requirement.

The ALJ specifically discussed Holland's use of medical marijuana. Tr. 24. The ALJ did not indicate that Holland abused marijuana, she simply reiterated a fact from Holland's treatment notes, i.e., that his providers would not prescribe opioid pain medication because he was using marijuana to manage his pain. *See id.* So, the ALJ did consider the reason why medications were prescribed for treatment and why certain medications were not prescribed.

With respect to Holland's refusal to undergo radiofrequency ablation, Holland argues that the ALJ failed to consider that he refused that procedure due to his anxiety. Doc. 10, at 19. There are two issues with Holland's course-of-treatment argument in this regard. First, the ALJ concluded that Holland's "anxiety d[id] not cause more than minimal limitation in this claimant's ability to perform basic mental work activities and is therefore nonsevere." *Id.* For this reason, the ALJ found that "[a] preponderance of the evidence supports only mild findings." *Id.* Holland, notably, does not challenge this holding. The ALJ further identified that Holland's "course of treatment [for anxiety] was extremely limited" and that he only recently sought mental health treatment

23

in May 2023. *Id.* at 20–21. Holland provides no explanation why, after reaching these conclusions, the ALJ was required to nevertheless give credence to Holland's anxiety as a reason to refuse the radiofrequency ablation that Holland's providers recommended. Second, as the Commissioner points out, radiofrequency ablation, is not a surgical procedure. *See* Doc. 12, at 14.[10] Holland does not dispute the nature of the radiofrequency ablation procedure in his reply brief. So, as the Commissioner says, this argument is a red herring. *Id.*

Read as a whole, the ALJ's opinion demonstrates that she did appropriately consider Holland's marijuana use and anxiety when evaluating his subjective complaints. This case is thus distinguishable from the cases like *Eddington* that Holland cites, *see* Doc. 10, at 17–18, because the ALJ here considered the reasons underlying his course of treatment.

Additionally, the ALJ said that she "careful[ly] consider[ed] … all the evidence." Tr. 18. Absent evidence to the contrary, the Court will presume that this statement is true. *See Newark Elec. Corp.*, 14 F.4th at 163. The ALJ's

---

[10]    Radiofrequency ablation is a procedure that uses heat to destroy tissue. When used for pain management, radio waves are administered using a precisely placed need to heat an area of nerve that prevents pain signals from being sent to the brain. During the procedure, a local anesthetic is used to numb the area where the needle is inserted. The patient remains awake and aware during the procedure in order to answer the provider's questions during the procedure. It takes between 15 minutes and two hours to complete, depending on the treatment location and number of areas treated. *See* Cleveland Clinic, Health Library, *Radiofrequency Ablation for Pain Management*, https://my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation#procedure-details [https://perma.cc/CM67-ELZ4**].**

decision shows that she considered the evidence of Holland's course of treatment, as provided under Ruling 16-3p.

Third, Holland appears to concede that "the ALJ 'considered the claimant's daily activities' when finding Plaintiff's allegations unsupported and when finding Dr. Markovic's opinion unpersuasive." Doc. 10, at 20 (citing Tr. 25, 26). Dr. Markovic's opinion, however, is of limited relevance to Holland's current argument—that the ALJ improperly considered the evidence surrounding his subjective complaints. Dr. Markovic provided a check-box opinion, which the ALJ generally rejected as unpersuasive. *See* Tr. 26. In this regard, the Sixth Circuit in *Kepke v. Commissioner of Social Security* explained that although "checklist opinions are not per se unreliable" in social security cases, an ALJ can consider an opinion's checklist "format" and whether the opinion "'fail[s] to provide any explanation for [the doctor's] responses.'" 636 F. App'x 625, 630 (6th Cir. 2016) (quoting *Price v. Comm'r of Soc. Sec.*, 342 F. App'x. 172, 176 (6th Cir. 2009)). Given the checklist nature of Dr. Markovic's opinion and its lack of any explanation, the ALJ was on a sure footing in discounting the opinion and, as specifically relevant here, Dr. Markovic's opinions regarding her daily activities. *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Among other issues, the ALJ found Dr. Markovic's lifting and carrying limitations were inconsistent with Holland's own subjective statements, such as his ability to drive. Tr. 26. Holland's third argument laches on to that finding and claims that the ALJ erred by limiting her consideration of daily activities to the activity of driving. Doc. 10, at 20. But the ALJ did not limit her consideration only to Holland's ability to drive. She discussed several aspects of his daily activities, as self-reported in his hearing testimony and function report. *See* Tr. 25 (describing Holland's testimony that he could show and dress himself, read, and watch TV along with his function report that he could perform minor cleaning, prepare his meals, and drive a car). The ALJ specifically explained that Holland's "subjective reports were not ignored. … His complaints were accommodated with the exertional and non-exertional limits adopted, particularly the lifting, carrying, reaching, standing/walking, pushing, pulling, postural and environmental functional activities." Tr. 25.

Because the ALJ did discuss and adequately consider the factors listed under Ruling 16-3p, there is no basis for remand on this issue.

> *2. The ALJ properly considered the persuasiveness of Holland's chiropractor's check-box opinion.*

Next, Holland argues that the ALJ failed to discuss the supportability of Dr. Markovic's opinion. Doc. 10, 21–23. But, as Holland's own briefing demonstrates, *see* Doc. 10, at 21, the ALJ considered and explained his consideration, of both the supportability and consistency of Dr. Markovic's opinion, Tr. 26.

26

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

As an initial matter, Holland appears to argue that because Dr. Markovic was Holland's treating physician, the ALJ was required to give his opinion controlling weight. Doc. 10, at 21–22 (citing *Wilson C. v. Comm'r of Soc. Sec. Admin.*, 2022 WL 4244215, at *6 (S.D. Ohio Sept. 15, 2022)). But the "treating source" rule does not apply to applications, such Holland's, which were filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1520c, 416.920c.[11] To this end, Holland's reliance on *Wilson C.* is misplaced. In *Wilson C.*, the District Court compared the mandatory nature of both the current regulations' supportability and consistency factors with the previously applicable "good reasons" standard. 2022 WL 4244215, at *6–7. It reasoned that, since both rules included mandatory considerations, the same harmless error analysis established in the Sixth Circuit's decision in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 544 (6th Cir. 2004) should apply under the newer regulations. *Id.* at 7. So *Wilson C.* established that the same harmless error standard would apply under the new regulations, not that the ALJ must apply the treating source rule. So Holland's argument is not off to a promising start.

---

[11]     Current regulations governing opinion evidence apply to applications filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c. For claims filed before March 27, 2017, 20 C.F.R. § 416.927(c)(2), known as the "treating source rule," applies. Under this rule, the ALJ must give a treating source's opinion controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And ALJs must provide "good reasons" for the weight they give to treating physicians' opinions. 20 C.F.R. § 416.927(c)(2).

28

Here, Holland only challenges the ALJ's discussion of supportability, claiming that the ALJ failed to discuss the issue. Doc. 10, at 22–23. But the ALJ did discuss supportability. For instance, the ALJ explained that Dr. Markovic's letters and check-box questionnaire, which the ALJ considered to be his medical opinions, were "not well supported." Tr. 26. The ALJ identified that Dr. Markovic provided "selections but no explanations or citation to evidence" in his opinions. *Id.* She also explained that his "letter indicated subjective pain but d[id] not offer any functional opinions." *Id.* Further, the ALJ noted that Dr. Markovic's unsupported opinions were "not fully consistent with the record" and explained why. *Id.*

Holland argues that ALJ didn't specifically discuss other record evidence from his treatment with Dr. Markovic when evaluating the supportability of Dr. Markovic's opinion. But the evidence Holland provides in an effort to show that Dr. Markovic's opinion was supported is not referenced anywhere in Dr. Markovic's opinion. *Compare* Doc. 10, at 23 (citing other treatment notes from Markovic), *with* Tr. 377–78 (Markovic's check-box opinion). So when the ALJ considered supportability, there was nothing in Dr. Markovic's opinion that connected his opinion to his treatment of Holland. For this reason, check-box opinions, like Markovic's, have been found to be "patently deficient." *Dollinger v. Comm'r of Soc. Sec.*, No. 22-3359, 2023 WL 1777386, at *4 (6th Cir. Feb. 6, 2023) (a checkbox form completed by a treating source which only contained a brief explanatory note for the assessed

limitations "is the kind of 'vague and unhelpful' opinion that is patently deficient and could not have been credited by the Commissioner") (quoting *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009)). As Holland highlights: "The more relevant the objective medical evidence and supportive explanations *presented by a medical source* are to support … his … medical opinions … , the more persuasive the medical opinions … will be." Doc. 10, at 22 (emphasis added) (citing *Goodman v. Soc. Sec. Admin.*, 2024 WL 623894, *14 (N.D. Ohio Feb. 14, 2024), in turn quoting 20 C.F.R. § 416.920c(c)(1)). The ALJ considered the "objective medical evidence and supportive explanations presented" in Dr. Markovic's opinion and found that the ALJ hadn't presented any. The ALJ's conclusion that Dr. Markovic's opinion was "not well supported" is supported by substantial evidence.

For all of the reasons stated, Holland's second issue provides no basis for remand.

> ### 3. The ALJ properly evaluated the state agency reviewers' opinions and supported her reasoning with substantial evidence.

Lastly, Holland asserts that the ALJ's evaluation of the state agency medical consultants failed to comply with applicable regulations which require discussion of supportability and consistency. But when viewed as a whole, the ALJ's decision adequately addressed the supportability and consistency of the state agency reviewers' opinions.

Holland argues that the RFC determination is not supported by substantial evidence because it contains limitations more restrictive than

those opined by the state agency medical consultants, despite the ALJ's finding that those opinions were partially persuasive. This is a confusing argument because the ALJ adopted greater limitations than the state agency reviewers' opinioned. *See* Tr. 22, 25–26. So even if the ALJ erred in analyzing the state agency reviewer's opinions, that error—which benefitted Holland—is harmless at best. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the opinions of the state agency consultative examiners) (citations omitted); *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

To the extent that Holland is also arguing that the ALJ erred by limiting him to frequent reaching instead of occasional reaching, see Doc. 10, at 9, the ALJ's finding is consistent with the state agency reviewer's opinions. *See* Tr. 69 (finding unlimited handing, finger, and feeling and limiting to frequent reaching in front and overhead on right side only). Holland cites nothing that would support the argument that the ALJ was required to limit Holland in all areas of reaching generally simply because she found a limitation related specifically to overhead reaching. Indeed, no state agency reviewer opined that Holland should be limited to occasional reaching. *See* Tr. 69 (limiting to frequent reaching in front and overhead with right arm only); Tr. 79 (limiting to frequent reaching in front and overhead with right arm only). Further, the ALJ explained that the limitation for occasional overhead reaching was based

31

on Holland's shoulder pain and differentiated that from the general bilateral reaching limits imposed. Tr. 26. Similarly, Holland appears to take issue with the ALJ's limitation regarding handling and fingering. Doc. 10, at 24–5. But the rationale for this limitation was also explained, Tr. 26, and it is greater than what the state agency reviewers opined. So any error, assuming there was one, was harmless. *See Laney*, 2022 WL 2176539, at *7.

The ALJ was not required to recite all of her findings again when evaluating the state agency reviewer's opinions. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).  For instance, the ALJ referenced her earlier discussion of left leg pain and other symptoms to explain why the standing or walking adopted were supported by those symptoms. *See* Tr. 25. She further noted that records showed Holland's leg strength was generally preserved and why. *Id.* Consequently, the limitation opined by the state agency reviewers for sitting was rejected as inconsistent. *Id.* The ALJ further provided greater limitations in handling and fingering, based on Holland's periodic radicular complaints, and for environmental conditions, based on Holland's reports of asthma. Tr. 26. In sum, the ALJ adequately discussed her rational for finding the state agency reviewer's opinions only partially persuasive.

The ALJ is afforded a "zone of choice." *Lindsley*, 560 F.3d at 605. So long as substantial evidence exists to support an ALJ's decision, it is not this Court's role to reject that choice simply because evidence may exist to support a different choice. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The

decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.").

Simply put, the ALJ's decision is supported by substantial evidence and her evaluation of the state agency reviewer's opinions was complied with applicable regulations.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 14, 2025

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).